Filed 10/1/14  P. v. Riser CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B245327 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. YA075152) |
| v. | |
| DEANDRE BRANDON RISER et al., | |
| Defendants and Appellants. | |

APPEALS from judgments of the Superior Court of Los Angeles County.  Mark S. Arnold, Judge.  Affirmed.

Robert Franklin Howell, under appointment by the Court of Appeal, for Defendant and Appellant Deandre Brandon Riser.

Richard D. Miggins, under appointment by the Court of Appeal, for Defendant and Appellant Olton Vernell Drake.

John A. Colucci, under appointment by the Court of Appeal, for Defendant and Appellant Helen Eva Spry.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Margaret E. Maxwell and Douglas L. Wilson, Deputy Attorneys General, for Plaintiff and Respondent.

Defendants and appellants (defendants) Deandre Brandon Riser (Riser), Olton Vernell Drake (Drake), and Helen Eva Spry (Spry), appeal from their convictions of murder and attempted murder. Each defendant joins in any applicable arguments of their codefendants. Challenging the admission of three surreptitiously recorded conversations between Riser and Drake while sharing a jail cell, defendants assert violations of the Fourth Amendment, the confrontation clause, and the hearsay rule. In addition, Spry contends that the trial court erred in failing to give the jury accomplice instructions and that the prosecutor argued an improper theory of guilt. Drake contends that the evidence was insufficient to support a finding that he harbored an intent to kill. Drake and Spry contend that a sentence enhancement must be stricken as unauthorized due to defective pleading. We find defendants' contentions to be without merit or forfeited, and affirm the judgments.

## BACKGROUND

**Procedural history**

All three defendants were named in each count of the nine-count information. Count 1 charged them with the murder of Amador Cendejas-Cortes (Cendejas-Cortes), in violation of Penal Code section 187, subdivision (a).[1] Counts 2 through 9 charged defendants with the attempted, willful, deliberate, and premeditated murder in violation of sections 664 and 187, subdivision (a), of the following persons, respectively: Juan Carlos Laben (Laben);[2] Maribel Magallon (Magallon); Jesus Rodriguez Negrete (Jesus); Hugo Sanchez (Sanchez); Jorge Cantu (Cantu); Mitsuhiro Nakano (Nakano); Jesus Rodriguez Torres (Torres); and Bryan Rodriguez Negrete (Bryan).

The information alleged with regard to counts, 1, 2, 3, 4, 5, and 6, that a principal and Riser personally used and intentionally discharged a rifle, causing great bodily injury or death to Cendejas-Cortes, Cantu, Laben, Magallon, Jesus, and Sanchez, within the

---

[1]     All further statutory references are to the Penal Code, unless otherwise indicated.

[2]     Laben spelled his name when he testified at trial, but the information was not amended. We use his spelling.

meaning of section 12022.53, subdivisions (b), (c), (d), and (e)(1). As to counts 7, 8, 9, the information alleged that a principal and Riser personally used and intentionally discharged a rifle, within the meaning of section 12022.53, subdivisions (b), (c), and (e)(1). With regard to all nine counts, it was alleged pursuant to section 186.22, subdivisions (b)(1)(C) and (b)(4), that the crimes were committed for the benefit of, at the direction of, and in association with a criminal street gang, with the specific intent to promote, further and assist in criminal conduct by gang members. The information further alleged pursuant to the "Three Strikes" law (§§ 1170.12, subd. (a)-(d), 667, subd. (b)-(i)), that Riser and Drake had each suffered a prior serious or violent felony conviction or juvenile adjudication. For purposes of section 667.5, subdivision (b), Riser was alleged to have suffered two prior convictions with qualifying prison terms.

Defendants were jointly tried, and a jury found each defendant guilty of all nine counts as charged, found the murder to be in the first degree, and as to Spry and Riser, found all the attempted murders to have been willful, deliberate, and premeditated. Through inadvertence the willful, deliberate, and premeditated finding was omitted from Drake's verdict forms for counts 2 and 6. Thus the jury made true findings on that allegation only as to counts 3, 4, 5, 7, 8, and 9. The jury found true the gang and firearm allegations as to all nine counts, including the allegation under section 12022.53, subdivision (d), which had been alleged in the information only as to counts 1 through 6.

Drake admitted a prior juvenile adjudication for robbery for purposes of the Three Strikes law. Riser stipulated to the admission of conviction records, and the trial court found that he had been convicted as alleged. Riser and Drake were sentenced November 6, 2012, and Spry was sentenced January 7, 2013. The trial court sentenced defendants to aggregate prison terms as follows: Riser's total term was 395 years to life; Drake's total term was 338 years 8 months to life; and Spry's total term was 50 years to life. The trial court awarded presentence custody credits, imposed mandatory fines and fees, ordered defendants to provide DNA samples, and ordered defendants to pay victim restitution of $52,925.43 as a joint and several liability.

Defendants filed timely notices of appeal.

3

**Prosecution evidence**

*The shootings and investigation*

On April 29, 2009, at approximately 10:30 p.m., Jaime Carpio (Carpio) was cooking inside his taco truck at its usual location on Inglewood Avenue near its intersection with Lennox Boulevard, with about 15 customers outside. When Carpio heard gunshots and saw people collapsing or throwing themselves onto the ground, he looked out the window, saw an African-American man wearing a black hooded sweatshirt and blue pants, shooting a rifle toward his customers. When the shooting stopped, the man walked quickly away toward Lennox Boulevard.

Los Angeles County Deputy Sheriff Ernesto Castaneda and his partner arrived within minutes and found a chaotic scene and six gunshot victims, including Cendejas-Cortes who was soon declared dead by paramedics. He died when a bullet perforated his brain and entered his brain stem. The surviving victims suffered the following wounds: Laben was shot in the head; Cantu was shot in his right hip; Magallon was shot in the chest as she stood next to Nakano; and Jesus was shot in the upper back as he stood next to his father, his brother Bryan, and his cousin Sanchez, who was shot in his shin and thigh. All the victims were customers of the taco truck.

At the time of the shooting Detective John Sanchez was patrolling with his partner Deputy Colter about a block from the crime scene. They heard what sounded like fireworks and then saw a white two-door car pass them at a high rate of speed, eastbound on Lennox Boulevard. The headlights of the patrol car illuminated the interior of the white car as it passed, and Detective Sanchez could see a white female driver and an African-American man in the front passenger seat. The deputies proceeded to the area of Inglewood Avenue and Lennox Boulevard, where a man later identified as Fred Meza (Meza) flagged them down, saying excitedly, "They just shot at us, they just shot at us, they just shot up the taco truck." When Meza described the shooter as a Black man who retreated into the passenger seat of a white two-door car, the deputies asked Meza to come with them in search of the car. Detective Sanchez went back on Lennox Boulevard the way they came. As they searched the area they soon saw a white Camaro, the same

4

white car they had seen earlier, coming out of the parking lot of the Top Value Market. After Meza exclaimed from the backseat, "That's the car, that's the car," the deputies followed it, stopped it as backup arrived, and detained the occupants, later identified as Riser, Drake, and Spry.

About an hour later, Deputy Silvio Paz brought Carpio to the place where the Camaro had been stopped. Carpio identified the pants worn by Riser as being the same as worn by the shooter, but noted that he was not wearing the same shirt. Carpio identified the black "hoodie" worn by Drake as resembling what the shooter had been wearing.

Witness Ramiro Huerta (Huerta) was also brought to the suspects' location. Huerta had been parking his van near the taco truck when he heard about 10 gunshots and saw the shooter, whom he described as a man wearing a black hoodie and dark blue jeans, shooting a long .22-caliber rifle toward a group of people near the taco truck. Huerta then saw the shooter leave on Inglewood Avenue toward Lennox Boulevard. When the deputies at the field show up showed him two African-American men, one by one, he said the second person resembled the shooter and was wearing blue jeans similar to the shooter's, but the first person was wearing a black hoodie similar to the shooter's.

Since no weapon was found in the Camaro, deputies searched the nearby area. A .22-caliber rifle was found under the tire of a water truck in the parking lot of the Top Value Market. The overall length of the rifle was 40 inches and it had a magazine that held 18 cartridges. Scratches on the rifle were consistent with it having been thrown from a moving vehicle. An analysis of the DNA later extracted from the rifle identified four people as possible contributors of the DNA: Drake, Spry, Riser, and Jamaine Sumner. A fingerprint analysis of rifle and bullets revealed no latent prints. Firearms experts determined that the expended casings found at the crime scene had been fired from the rifle and that the rifle had misfired and jammed, leaving an unexpended bullet with a strike mark in the chamber and eight rounds in the magazine. Particles consistent with gunshot residue (GSR) were recovered from Drake's hand and the black T-shirt worn by Riser at the time of his arrest.

5

Surveillance video obtained from a market near the crime scene was located and portions of it were played for the jury. The tape showed a dark figure emerge from a white two-door car and then move westbound across the parking lot before disappearing from view. The same dark figure is seen running eastbound through the parking lot and disappearing two seconds before the white car is seen pulling away from the curb and driving east on Lennox Boulevard. A black-and-white Sheriff's car comes into view 29 seconds later, traveling west on Lennox Boulevard, stopping as a person approaches. Moments later, the person gets into the patrol car behind the driver. The patrol car makes a U-turn and then moves out of view.

### *Eucalyptus Park incident and gang evidence*

At the time of the shootings, Riser and Drake were members of the West Side 118th Street Eucalyptus Gangster Crip gang, known as the Eucalyptus Mob, or for short, "U-Mob" or "Eumob." Spry was not a member, but she associated with the gang. Favessi Peni Samatua (Samatua) testified that he was a Eumob member at that time, although he later left the gang and moved out of state after being shot several times. Samatua knew fellow Eumob members Riser and Drake and typically saw them several times per week in 2009. Samatua had known Spry since high school, and during 2009 she would "hang out" with Eumob members occasionally. Samatua also knew Eumob gang member Jamaine Sumner, who went by the nickname "J-Dog." Samatua's gang name was "S" or "S-Loc."

Samatua testified that he spent much of the day of the shooting in Eucalyptus Park in the City of Hawthorne, drinking with Drake and Riser. At one point a group of Lennox 13 gang members (a despised rival gang) walked by the park "throwing" gang hand signs and yelling their gang name. This made Samatua angry, and resulted in a fistfight between the three Eumob members and the Lennox 13 members. Samatua admitted that his group was outnumbered by the Lennox 13 group, but denied they were beaten and claimed he did not know how the fight stopped. A few hours later, a car containing four or five Lennox 13 gang members was driven back and forth on the street next to the park. Again, the Lennox 13 members yelled out "Lennox" and made their

6

gang's hand signs. They were soon joined by a second group of Lennox 13 gang members, more than 10, who arrived on foot, calling out "Lennox" and displaying their gang's hand signs. Another fight ensued, which ended when police arrived.

Spry was also at the park with Riser and Drake sometime that day, but Samatua did not know whether she was there at the time of the fights. Later, Riser was so upset about the fight that he and Samatua nearly fought each other while discussing it. In the evening Samatua left his companions and went home. The next morning he heard about a shooting near a taco truck in the area of Inglewood Avenue and Lennox Boulevard, which Samatua knew to be Lennox 13 gang territory. He testified that no Eumob member would walk into that area without expecting to have problems with the Lennox 13 gang.

The prosecution's gang expert was Detective Keith Chaffin of the Hawthorne Police Department. Detective Chaffin testified that Eumob's primary activities included robbery, burglary, narcotics offenses, weapons possession, drive-by and walk-up shootings, and other violent crimes. Eumob's territory consisted of a northwest corner of the City of Hawthorne, including Eucalyptus Park, where its members often congregated. The territory was bounded on the north by Imperial Highway, which also formed the southern boundary of the rival Lennox 13 gang. The Lennox 13 gang's territory included the area around Inglewood Avenue and Lennox Boulevard, where the shooting took place. Like most gangs, Eumob and Lennox 13 were both very territorial. Detective Chaffin explained that gang members viewed their territory much as a nation would view its sovereignty. As a result of the two gangs' rivalry, both have committed violent attacks on each other, usually in the form of shootings and other assaults.

Detective Chaffin also explained the importance to gang members of "respect." In gang culture respect meant "everything" to gang members. Gang members believe the more people fear them, the more respect they would have; thus respect is earned through intimidation. For rival gang members to enter "enemy" territory to "stir things up" by yelling out their own gang's name and flashing their own gang's hand signs would be a

challenge to the rival gang and a show of disrespect.  A gang member could lose the respect of his gang if he were beaten by a rival gang member in a fistfight.

Gang members gain status within the gang by "putting in work" or "going on missions" for the gang, meaning committing crimes that benefit the gang.  Gang members, especially younger members, were expected to put in work for the gang, to be active in gang activities, and to contribute money to the gang.  This way, members earned greater status within the gang and the gang itself earned greater respect.

In response to a hypothetical question using facts mirroring the facts of this case, Detective Chaffin gave his opinion that such a crime was committed in retaliation for the fights that day in the park, which would benefit the Eumob gang by helping it to protect its territory from the rival gang.  It would also benefit the Eumob gang by increasing its violent reputation, increasing respect for the gang, and making citizens afraid to cooperate with the police.  As long as the attack took place in Lennox 13 territory, it did not matter that none of the victims was a gang member; the crime would still benefit the gang and raise the status of the two members involved in its commission.

### Jailhouse conversations

Spry was released about a day after her arrest and then rearrested five or six weeks later.  Drake and Riser remained in custody throughout the investigation.  The lead detectives in this case, Sergeant Shannon Laren and Sergeant William Cotter, arranged to have Drake and Riser placed together in a cell with a recording device, on April 30, 2009, the day after the shootings, and then again on May 5 and June 12.  Three hours of recordings were excerpted from the three sessions and played for the jury.  Riser and Drake discussed their participation in the crime, Spry's involvement, the evidence, witnesses, potential prison terms, and whether Spry and others would provide information to law enforcement.

Though Spry was not mentioned by name, Riser and Drake discussed a female driver; for example, early in the April 30 conversation, Riser said, "She won't get out just cause she was the driver."  Drake complained that the route driven caused their arrest:  "I don't know what the fuck she went that way for anyway.  Straight towards the God damn

8

[Sheriff] station. Well, if we wouldn't have (Yawn) turned up in there in the first place, we would have been down Hawthorne already." Later, he said: "She should have went the other way. We should a made that lap and gone down Century man. But it's always too late"; and, "Damn, wish we would've got in the car with J-Dog low key." When Riser said, "I hope she stays solid," Drake thought the chances of that were "real slim," adding, "Ol' bitch don't look like she's ready to do no fucking life." Drake also expressed concern that Samatua would talk: "Everybody know about that and they know who did this shit. You know, S-Loc's stupid ass gonna be at the park gibbering and shit."

Among other subjects in the April 30 conversation, Riser and Drake also speculated about the evidence law enforcement had against them. Referring to the rifle, Drake said, "They ain't got no burner." When Riser told him that the rifle had been found and that he had seen photographs of it on the ground on the construction site, Drake replied, "Oh, terrible." When Riser complained that his DNA had been taken, Drake said, "That shit ain't gonna do nothing. You didn't touch nobody." Riser replied, "I didn't even touch nothing." Drake expressed the opinion that there would be no fingerprints on the gun and unless they found gun powder on Riser, there would be no evidence against them.

Riser admitted he was the shooter after Drake asked him: "Was you walking forward or backing up when you was shootin?" Riser replied, "I was just standing there." Drake said he did not know whether a "deuce deuce rifle" would eject gunpowder close to the shooter.[3] Drake said it "didn't even sound like no six shots," but added, "Five got hit and one got killed," and concluded, "So that means, ever single bullet hit somebody. There wasn't no leftover bullets." Riser corrected him: "There was in the gun."

In the May 5 conversation, Drake expressed his belief that Spry had talked to the police because "The bitch went home." Riser disagreed and believed that Spry was released because "She got a DA reject." But Drake insisted: "There's no way in the

---

**3** Sergeant Laren explained that the term "deuce deuce" was street vernacular for a .22-caliber weapon. Sergeant Cotter testified that when he told Riser that they had recovered a rifle, he did not specify the caliber or type of rifle.

world that bitch could have a DA reject and we can't if she was the fucking driver," adding, "[S]he can't say we fucking forced her to do it. She just can't." Drake later said that "the shooting isn't what was sloppy. It's that bullshit ass getaway . . . ." Drake said he knew he "would be doing some type of time just for sitting in the back seat," and believed that Spry would do time because she was in the driver's seat. When Drake said "you're going to do time, especially with her been in the fucking driver's seat," Riser replied, "[Redacted] she knew. She knew -- before she turned the car on [redacted] she knew."

Apparently discussing witness statements or a report, Drake said that he was identified as the shooter, because witnesses said that the shooter was wearing a black hoodie and he "was the only nigga with a hoodie on." He said that "they didn't have no witnesses to say who did this . . . so they wrote that shit up theirself." Drake later told Riser that he had thrown his gloves out of the window on Hawthorne Boulevard as cars passed by, and asked Riser whether he had thrown his; Riser replied that the police did not recover gloves.

Drake and Riser were again placed together on June 12, and were told that they were there for a deputy to take photographs of their tattoos. Riser told Drake that he was "not in no gang" and was going to tell them that a particular tattoo was for a "party crew." By the time of the June 12 conversation, the two defendants' attorneys had told them about the two prior recorded conversations. Referring to the prior recordings, Riser said, "I don't think they going be able to use that," and Drake agreed. Drake later said, "I don't talk to no one," and Riser said that he had not used the telephone because "I don't know when they recording some shit and when they ain't recording some shit. You got to speak in fucking . . . different languages . . . ."

Riser and Drake again discussed the possibility that Spry was cooperating with law enforcement. Riser said, "You know she's snitchin' too. She's snitchin'." Drake agreed, and after describing her behavior in court and on the jail bus, he said, "I already knew she's going start telling."

10

Riser had learned that GSR had been detected on his shirt and on the hoodie, and that Drake's DNA was found on the rifle. When he told Drake this, Drake replied, "That's impossible." Riser suggested that it happened when Drake "was loading it up that night." He explained, "You was touching that shit," referring to "[t]he piece that you put the back of the shells at." Drake replied that he had used a napkin not his bare hands.

Riser then said that he was trying to learn who the witnesses were and to obtain reports. He suggested that Drake have his "girl or whatever" find out the names of people she knew, and "tell 'em don't come to court." Riser knew that Meza, the owner of the taco stand was the "main" witness. He explained, "That's the one that told on us that night. He's the one that flagged the motherfuckers down," and "He was in the back of that cop car the night we seen him off the boulevard."

After discussing the possibility of attempt charges, Riser observed, "We fucked up. We fucked up when we started talking." Drake suggested that he ask his attorney whether the recorded conversations could be used against them. Drake said that his attorney told him that the detectives had tricked him. Riser replied, "Damn, they . . . [h]e probably didn't even know about me. Oh, god."

Riser told Drake that "she" had said that "it all started" with the "park incident where we caught them coming from the school," and that was "the reason we all went over there." Drake pointed out, "But see, you look, this gang shit we can't buy because none of them was gang members, none of them." He added, "None of them . . . . That's what we was hoping it was. But they wasn't."

Riser said that when he saw Spry crying in court, he gave her a look that indicated "you was with it, bitch, you was with it." Drake remarked, "You the dumb ass bitch that drove up past the fucking police station."

**Defense evidence**

Defendants did not testify. Riser called Sergeant Cotter, who testified that he had interviewed Samatua in July 2009 about the Eucalyptus Park incidents, and had asked whether Drake or Riser appeared angry afterward. Samatua did not recall. Sergeant

11

Cotter explained that Samatua was somewhat guarded in the interview, and that he had been shot in the stomach just a month earlier.

Carpio's preliminary hearing testimony was read concerning his identification of the shooter during the field show up the day of the shooting and later when he identified Drake in court as the person he identified at the field show up.

## DISCUSSION

### I. Jailhouse conversation

#### A. *Riser's Fourth Amendment challenge*

Other than joining in his codefendant's arguments to the extent they might benefit him, Riser's sole contention on appeal is that the jailhouse recordings were made in violation of the Fourth Amendment. As respondent observes, Riser has forfeited this contention, as he did not raise a Fourth Amendment claim in the trial court. (See *People v. Zepeda* (2001) 87 Cal.App.4th 1183, 1192-1193.)

Moreover, the contention lacks merit: pretrial detainees, like convicted prisoners lack *any* legitimate expectation of privacy in jail cells. (*People v. Davis* (2005) 36 Cal.4th 510, 527; see *Hudson v. Palmer* (1984) 468 U.S. 517, 526-527.)

Riser relies on dictum in an earlier case, that "'it is conceivable that in a given case the police might make representations to even an incarcerated defendant that would cause him to have a right of privacy.'" (*North v. Superior Court of Riverside County* (1972) 8 Cal.3d 301, 310-311.) In that case, a detective lulled the defendant into believing that his conversation with his wife in a private office would be confidential. (*Id*. at p. 311.) Here, Riser and Drake were codefendants, not spouses; they were in a jail cell, not a private office, and no representations were made to them regarding privacy.

Riser also suggests that defendants retain a limited expectation of privacy that precludes jailhouse recordings for the purpose of collecting evidence, rather than for legitimate security reasons. He relies on a line of cases that was expressly rejected by the

California Supreme Court in *People v. Davis, supra*, 36 Cal.4th at pages 526-527.[4]  We must do so as well.  (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

### B. *Crawford*

Drake and Spry contend that the admission of the jailhouse conversations violated the confrontation clause of the Sixth Amendment under the principles set forth in *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*).  Their contention lacks merit, as the confrontation clause applies only to testimonial hearsay.  (*Id*. at p. 51; *Davis v. Washington* (2006) 547 U.S. 813, 823-826 (*Davis*); *People v. Gonzales* (2012) 54 Cal.4th 1234, 1270.)  An inmate's surreptitiously recorded jailhouse conversation during which there has been no law enforcement interrogation is not testimonial.  (*People v. Arauz* (2012) 210 Cal.App.4th 1394, 1401-1402; see *Davis, supra*, at p. 825, citing *Bourjaily v. United States* (1987) 483 U.S. 171, 181-184 [statements unwittingly made to government informant], and *Dutton v. Evans* (1970) 400 U.S. 74, 87-89 [conversation between prisoners].)

Spry and Drake both contend that because the recordings were made expressly for use at trial, they are testimonial.  This argument is apparently derived from the following possible formulation of "testimonial" in *Crawford*:  "'[S]tatements . . . made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'"  (*Crawford, supra*, 541 U.S. at p. 52.)  A broad construction of that language has been rejected by the California Supreme Court, as it "could apply to virtually every out-of-court statement purporting to describe the circumstances of a crime or to identify its perpetrator, insofar as a reasonable person

---

[4]     E.g. *United States v. Cohen* (2d Cir. 1986) 796 F.2d 20; *United States v. Friedman* (2d Cir. 2002) 300 F.3d 111; *United States v. Willoughby* (2d Cir. 1988) 860 F.2d 15; *Rogers v. State* (Fla. 2001) 783 So.2d 980; *McCoy v. State* (Fla.Dist.Ct.App. 1994) 639 So.2d 163; *State v. Henderson* (1999) 271 Ga. 264 [517 S.E.2d 61]; *Lowe v. State* (1992) 203 Ga.App. 277 [416 S.E.2d 750]; *State v. Jackson* (1999) 321 N.J. Super. 365 [729 A.2d 55]; *United States v. Hearst* (9th Cir. 1977) 563 F.2d 1331.

could conceive that the statement might later become criminal evidence." (*People v. Cage* (2007) 40 Cal.4th 965, 984, fn. 14.) Thus, as confirmed by *Davis*, "the proper focus is not on the mere reasonable chance that an out-of-court statement might later be used in a criminal trial. Instead, we are concerned with statements, made with some formality, which, *viewed objectively*, are for the *primary purpose* of establishing or proving facts for possible use in a criminal trial." (*People v. Cage, supra*, at p. 984, fn. 14.) That formality is not present in a secretly recorded conversation between inmates. (See *People v. Arauz, supra*, 210 Cal.App.4th at pp. 1401-1402; *People v. Jefferson* (2008) 158 Cal.App.4th 830, 842-844.)

### C. Bruton

Drake and Spry contend that the jailhouse recordings were admitted in violation of the rule of *Bruton v. United States* (1968) 391 U.S. 123 (*Bruton*), which generally precludes the admission of a statement or confession of a nontestifying defendant that inculpates another defendant when the defendants are jointly tried. (*Id.* at pp. 127-128; see also *People v. Aranda* (1965) 63 Cal.2d 518, 529.) Because *Bruton* is premised on the Confrontation Clause, it does not apply to nontestimonial statements. (*People v. Arceo* (2011) 195 Cal.App.4th 556, 571.) As we have already concluded that the recorded conversations were not testimonial we reject this contention as well.[5]

### D. Declarations against interest

Spry contends that the trial court abused its discretion in ruling that the jailhouse conversations were declarations against interest and thus admissible under Evidence Code section 1230. As relevant here, Evidence Code section 1230 provides an exception to the hearsay rule when the "declarant is unavailable as a witness and the statement, when made, . . . so far subjected him to the risk of civil or criminal liability, or . . . created such a risk of making him an object of hatred, ridicule, or social disgrace in the

---

[5]     If the conversations had been testimonial, Drake's contention would be meritless for the additional reason that the rule does not apply to joint interrogations in which both defendants implicate themselves. (*People v. Osuna* (1969) 70 Cal.2d 759, 765; see *People v. Jennings* (2010) 50 Cal.4th 616, 662 (*Jennings*).)

14

community, that a reasonable man in his position would not have made the statement unless he believed it to be true."**6**

The court's ruling was made in a pretrial hearing on Riser's motion to sever defendants' trials and the prosecutor's motion to admit the jailhouse recordings. Riser objected to the admission of the conversations in a joint trial, challenging the entirety of the conversations as a violation of the confrontation clause and the *Bruton* rule. Spry's counsel joined in the objection. Spry concedes that Riser and Drake implicated themselves in some parts, but now for the first time on appeal, challenges particular passages which implicate her without being specifically disserving to either Riser or Drake.

As Spry notes, a "hearsay statement 'which is in part inculpatory and in part exculpatory (e.g., one which admits some complicity but places the major responsibility on others) does not meet the test of trustworthiness and is thus inadmissible.' [Citations.]" (*People v. Duarte* (2000) 24 Cal.4th 603, 612.) Thus, "this hearsay exception does not apply to collateral assertions within a declaration against penal interest -- i.e., any portion of a statement that is not itself specifically disserving to the declarant's interests [citation] . . . ." (*People v. Valdez* (2012) 55 Cal.4th 82, 144 (*Valdez*).) However, in exercising its discretion in making this determination, each challenged statement must be viewed in context. (*Ibid*.) "'The trial court must look to the totality of the circumstances in which the statement was made, whether the declarant spoke from personal knowledge, the possible motivation of the declarant, what was actually said by the declarant and anything else relevant to the inquiry. [Citations.]' [Citation.]" (*People v. Arauz, supra*, 210 Cal.App.4th at p. 1400, quoting *People v. Greenberger* (1997) 58 Cal.App.4th 298, 334.)

Spry did not object to any particular statement or statements within the recordings and did not ask the trial court to look at any particular statement either in isolation or in context. A judgment may not be reversed by reason of the erroneous admission of

---

**6** It is undisputed that Riser and Drake were unavailable because they could not be compelled to testify. (See *People v. Fuentes* (1998) 61 Cal.App.4th 956, 961-962.)

15

evidence unless: "(a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion; and [¶] (b) The [reviewing] court which passes upon the effect of the error or errors is of the opinion that the admitted evidence should have been excluded on the ground stated and that the error or errors complained of resulted in a miscarriage of justice." (Evid. Code, § 353.)

A confrontation clause objection does not preserve a state law hearsay objection. (*Jennings, supra*, 50 Cal.4th at p. 652.) Moreover, "it is settled law that where evidence is in part admissible, and in part inadmissible, 'the objectionable portion cannot be reached by a general objection to the entire [evidence], but the inadmissible portion must be specified.' [Citations.]" (*People v. Harris* (1978) 85 Cal.App.3d 954, 957.) Where the requirements of this rule were not observed, the appellant may not claim error in the admission of the full statement. (*People v. Romano* (1961) 197 Cal.App.2d 622, 637.) A trial court does not err "in failing to conduct an analysis it was not asked to conduct." (*People v. Partida* (2005) 37 Cal.4th 428, 435.)

Spry has thus forfeited her hearsay claim. Moreover, even where hearsay evidence was the only direct evidence of the defendant's guilt, any alleged error in admitting it will be found harmless when "'profuse circumstantial evidence'" established guilt. (*Jennings, supra*, 50 Cal.4th at p. 654, quoting *People v. Gutierrez* (2009) 45 Cal.4th 789, 813.) Here, the circumstantial evidence of Spry's guilt was overwhelming. Eucalyptus Park was in Eumob territory and members often congregated there. The shooting was in the territory of Lennox 13, Eumob's rival. Both gangs were violent and territorial, and it was common knowledge in the Eumob gang that if one of its members went into Lennox 13 territory, trouble was to be expected. Spry regularly associated with Eumob gang members, and had been at Eucalyptus Park during that day when Lennox 13 members invaded Eumob territory, picked a fight, and humiliated gang members Riser and Drake. Riser was visibly angry and faced the loss of respect from his gang. Spry was certainly with Riser and Drake at the end of the evening: Detective Sanchez saw a white female driver with an African-American man in the front passenger seat, speeding

16

away from the area of the shooting moments after the crime and when he stopped the car shortly thereafter, Spry was driving.

Spry was thus most likely the driver who waited in the car while one of her companions got out of her car in Lennox 13 territory, to walk around the corner looking for trouble. She could not have overlooked the 40-inch-long rifle with an 18-cartridge magazine he took with him and carried back to the car after several gunshots, nor was she likely to have missed it when the rifle was thrown from the window. With such evidence, the prosecution amply established that Spry was the getaway driver, that she knew why she was driving Riser and Drake into Lennox 13 territory, knew the purpose of the rifle, and knew what it was used for when shots were fired and the shooter came back to her car. In their jailhouse conversations, Riser and Drake merely confirmed Spry's knowing participation in the crime.

Spry acknowledges that the erroneous admission of hearsay evidence is tested for prejudice under that standard enunciated in *People v. Watson* (1956) 46 Cal.2d 818, 836: reversal is required only if the appellant shows a reasonable probability that without the error, she would have obtained a more favorable result. Not only have we found no error, we find no reasonable probability that exclusion of the jailhouse conversations would have produced a more favorable result for Spry.

## II. CALCRIM No. 335

Spry contends that the trial court erred in refusing to instruct the jury with accomplice instructions.[7] Because a conviction may not be based on the uncorroborated testimony of an accomplice (§ 1111), the trial court must instruct the jury sua sponte to

---

[7] Spry's counsel requested CALCRIM No. 334, which instructs the jury to determine whether a witness was an accomplice and if so to view his testimony with caution. Spry now contends that the court should have instructed with CALCRIM No. 335, that Riser and Drake were accomplices as a matter of law and to view their testimony with caution. We assume for this discussion that Riser and Drake were accomplices as a matter of law.

view with caution the testimony of an accomplice and to require corroboration. (*People v. Verlinde* (2002) 100 Cal.App.4th 1146, 1157.)

"'"[T]estimony" within the meaning of . . . section 1111 includes all oral statements made by an accomplice or coconspirator under oath in a court proceeding *and* all out-of-court statements of accomplices and coconspirators used as substantive evidence of guilt which are made under suspect circumstances. The most obvious suspect circumstances occur when the accomplice has been arrested or is questioned by the police.' [Citation.]" (*People v. Williams* (1997) 16 Cal.4th 153, 245; see also *People v. Carrington* (2009) 47 Cal.4th 145, 190-191.)

Circumstances are suspect when they are such that the accomplice is likely to have had self-serving motives that could influence his credibility, such as a desire to shift the blame. (*People v. Howard* (2008) 42 Cal.4th 1000, 1022-1023; *People v. Belton* (1979) 23 Cal.3d 516, 525-526.) Statements that "'are not given under suspect circumstances, . . . do not qualify as "testimony" and hence need not be corroborated under . . . section 1111.' [Citations.]" (*People v. Williams, supra*, 16 Cal.4th at p. 245.) Examples of circumstances that are *not* suspicious have included a surreptitious recording of two gang members at a gang meeting incriminating themselves (*People v. Maciel* (2013) 57 Cal.4th 482, 527), noncustodial statements to a fellow drug user, made with no motive to dissemble (*People v. Williams* (1997) 16 Cal.4th 153, 246), and declarations against penal interest (*People v. Brown* (2003) 31 Cal.4th 518, 555-556). Under such circumstances, statements are considered sufficiently reliable to require no corroboration, and the trial court is not required to instruct the jury to view the accomplice's statements with caution and to require corroboration. (*Brown*, at p. 556.)

Here, the trial court found that the jailhouse conversations were declarations against penal interest. Further, although Drake and Riser were in custody, the statements were not formal confessions or made in response to interrogation, and most of the statements incriminating Spry were made during the first two conversations, before Drake and Riser knew they had been recorded. They thus had little motive to dissemble, the circumstances were not suspicious, and the trial court was not required to instruct.

18

Moreover, the omission of the instruction was harmless. Error in failing to instruct "on accomplice liability under section 1111 is harmless if the record contains 'sufficient corroborating evidence.' [Citation.] Corroborating evidence may be slight, entirely circumstantial, and entitled to little consideration when standing alone. [Citations.]" (*Valdez, supra*, 55 Cal.4th at pp. 147-148.)[8]

We reject Spry's suggestion that unless the corroborative evidence established her state of mind, it must be deemed insufficient to connect her to the crime. Corroborating evidence must implicate the defendant, and to do so must relate to an element of the crime. (*People v. Boyer* (2006) 38 Cal.4th 412, 467.) However, "[i]t need not be sufficient to establish every element of the charged offense or to establish the precise facts to which the accomplice testified. [Citations.] It is 'sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth.' [Citation.]" (*Valdez, supra*, 55 Cal.4th at pp. 147-148.)

In any event, we have already found overwhelming evidence of Spry's knowing participation apart from the codefendants' statements: Spry was seen driving the car shortly after the shooting; she was a regular associate of members of the Eumob gang, a violent, territorial gang; in gang culture, respect was valued above all and trouble was to be expected when entering enemy territory; Riser was visibly angered by the disrespect shown by Lennox 13 members earlier in the day; Spry's passenger held a 40-inch-long rifle when he got out of the car; surveillance video showed that she waited for him to return; and she sped away from the scene to an area where the rifle was dumped. The corroborating evidence of her participation and her state of mind was thus sufficient, and any error was harmless.

---

[8]    Spry acknowledges this test for harmless error set forth by the California Supreme Court, but contends that the evidence lightened the prosecution's burden, and she asks that we instead deem it structural error which is reversible per se, or at the very least, review prejudice under the test of *Chapman v. California* (1967) 386 U.S. 18, 24 [to determine whether error was harmless beyond a reasonable doubt].) We decline, as our Supreme Court is the highest court to have considered the issue, and we follow its directive. (See *Auto Equity Sales, Inc. v. Superior Court, supra*, 57 Cal.2d at p. 455.)

19

### III. Theory of guilt

Spry contends that she was denied a fair trial and due process because the prosecution argued an improper theory of guilt and the trial court did not give a preclusive instruction. Spry contends that the prosecutor told the jury, in effect, that facts showing no more than liability as an accessory after the fact were sufficient for aider and abettor liability.

"A person aids and abets the commission of a crime when he or she, (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the crime. [Citation.]" (*People v. Cooper* (1991) 53 Cal.3d 1158, 1164.) The jury was correctly instructed as to the elements of aiding and abetting with CALCRIM No. 401.

There was no instruction with regard to liability as an accessory. An accessory is a "person who, after a felony has been committed, harbors, conceals or aids a principal in such felony, with the intent that said principal may avoid or escape from arrest, trial, conviction or punishment, having knowledge that said principal has committed such felony or has been charged with such felony or convicted thereof, is an accessory to such felony." (§ 32.) Thus a getaway driver who was unaware of the crime until after all the acts constituting it have been committed, but who assists in the escape after learning of the crime, is an accessory after the fact. (*People v. Cooper, supra*, 53 Cal.3d at p. 1168.)

Spry describes the challenged argument by paraphrasing part of it as follows: "The prosecutor argued that even if . . . appellant Spry was *unaware of the intentions of the shooter* that she would be liable as an aider and abettor because she drove the shooter from the scene knowing what he had done." (Italics added.) We agree with respondent that Spry has taken the prosecutor's remarks completely out of context and that she has incorrectly paraphrased them. In fact, the prosecutor argued: "[The Camaro is] a very small car. There is no way a person in the driver's seat could have overlooked or not seen that rifle. . . . Assuming arguendo, though, that, well, what if she didn't see it? We'll give her that. Right? . . . But when they finally got to the taco truck, she saw Mr.

20

Riser get out of the Camaro, heard gunshots, and at that point she should have know that Mr. Riser just did some shooting. Why then didn't she take off? Why then doesn't she leave? . . . She stayed there. Not only did she stay there . . . , she waited until [Riser] got in the car and sped off. That conclusively proves that [Spry] knew what was going to happen and she was down for the cause and did her role."

The prosecutor's theory was not that merely driving away made Spry and aider and abettor. The prosecutor argued that dropping Riser off, waiting for him even after the gunshots, and then speeding away showed that she "knew what was *going to* happen." Thus the argument was not that Spry had the requisite state of mind because she knew what *had happened*, as demonstrated by her driving to the scene and her conduct once there. This was not improper argument. Facts that suggest aiding and abetting include "'presence at the scene . . . , companionship, and conduct before and after the crime, including flight.'" (*People v. Medina* (2009) 46 Cal.4th 913, 924.) Thus, "among the factors which may be considered . . . is the presence of the accused . . . at the scene of the crime and his conduct afterwards. [Citation.]" (*People v. Hawkins* (1968) 268 Cal.App.2d 99, 104.)

Moreover, as the prosecutor did not misstate the law and no objection was made to her argument, Spry has forfeited this challenge. (See *People v. Morales* (2001) 25 Cal.4th 34, 43-44.) Spry contends that defense counsel's representation was deficient due to his failure to object. To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate both defective performance and prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 688-694; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1126.) As the prosecutor's argument did not incorrectly state the law, any objection would have been overruled. Failing to make meritless objections is not defective performance. (*People v. Ochoa* (1998) 19 Cal.4th 353, 463.)

Further, defendant has shown no prejudice. The trial court instructed the jury that an aider and abettor must know of the perpetrator's unlawful purpose and must "specifically intend[] to, and does, in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime." The court also instructed that "the fact that a

21

person is present at the scene of a crime or fails to prevent the crime does not by itself make him an aider and abettor." We agree with respondent that there was "no reasonable likelihood any juror would have applied the prosecutor's comments erroneously. [Citation.]" (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 93.)

## IV.  Intent to kill

Drake contends that there was insufficient evidence to support his attempted murder convictions.[9]

When a criminal conviction is challenged as lacking evidentiary support, "the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence -- that is, evidence which is reasonable, credible, and of solid value -- such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson*, *supra*, 26 Cal.3d at p. 578; see also *Jackson v. Virginia* (1979) 443 U.S. 307, 318-319.) We must presume in support of the judgment the existence of every fact the jury could reasonably deduce from the evidence. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) "The same standard applies when the conviction rests primarily on circumstantial evidence. [Citation.]" (*Ibid.*) We do not reweigh the evidence or resolve conflicts in the evidence. (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) Reversal on a substantial evidence ground "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

"Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing. [Citations.] . . . [T]o be guilty of attempted murder as an aider and abettor, a person must give aid or

---

[9]     More precisely, defendant contends that the evidence was insufficient to support the prosecutor's argument in summation. We review the record for substantial evidence to support the judgment. (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) Defendant does not claim prosecutorial misconduct and cites no authority that would otherwise require a review of the evidence supporting the prosecutor's argument.

encouragement with knowledge of the direct perpetrator's intent to kill and with the purpose of facilitating the direct perpetrator's accomplishment of the intended killing -- which means that the person guilty of attempted murder as an aider and abettor must intend to kill. [Citation.]" (*People v. Lee* (2003) 31 Cal.4th 613, 623-624.) "'[I]t is well settled that intent to kill or express malice, the mental state required to convict a defendant of attempted murder, may . . . be inferred from the defendant's acts and the circumstances of the crime.' [Citation.]" (*People v. Avila* (2009) 46 Cal.4th 680, 701.)

Initially, we observe that Riser's intent to kill was well established. Riser admitted in his conversation with Drake that he was the shooter. At least six rounds were fired, as six victims were hit. A "shooter's purposeful 'use of a lethal weapon with lethal force' against the victim, if otherwise legally unexcused, will itself give rise to an inference of intent to kill. [Citation.]" (*People v. Smith* (2005) 37 Cal.4th 733, 742.) "That the shooter had no particular motive for shooting the victim is not dispositive, although . . . where motive is shown, such evidence will usually be probative of proof of intent to kill." (*Ibid.*) Riser had been disrespected by enemy gang members earlier that day, and a motive to kill may be reasonably inferred from the hatred of rival gang members. (*People v. Rand* (1995) 37 Cal.App.4th 999, 1001-1002.) When a gang member fires multiple shots at a group of people in rival gang territory it is reasonable to infer that he harbored an intent to kill. (See *People v. Francisco* (1994) 22 Cal.App.4th 1180, 1192.)

Drake's motive may be inferred from the same facts: Drake was also a Eumob gang member; he was also at the park earlier that day with Riser and Samatua, and was subjected to the disrespect of rival gang members. As the gang expert testimony demonstrated, Drake had reason to accompany Riser, his fellow gang member, on the "mission" into Lennox 13 territory. Because the rival gang had effectively challenged Drake's gang, causing it to lose respect, Drake would face the loss of status within his gang if he did not rise to the challenge.

Drake claims that he made no statement in the jailhouse conversations indicating that he knew of Riser's intent beforehand. We disagree. First, Drake did not correct

Riser or indicate any disagreement with him when Riser said that "it all started" with the "park incident where we caught them coming from the school," and that was "the reason we all went over there." Drake then indicated that their intent was to shoot rival gang members when he said that "none of them was gang members," and added, "None of them. . . . That's what we was hoping it was. But they wasn't." Drake said "*we*"; he did not simply say that *Riser* was hoping they were gang members. The jury was instructed on the law of adoptive admissions, and could reasonably have inferred Drake's motive and intent from his own words and reactions to Riser's words. (See Evid. Code, § 1221; *People v. Riel* (2000) 22 Cal.4th 1153, 1189.)

Drake also argues that the following facts prove nothing: merely loading the rifle, his DNA on the rifle, the GSR on his hand, and his admission that he had gloves. He also suggests that his conduct after the shooting cannot provide substantial evidence of his intent prior to the shooting. Such arguments might have more force if each such fact is viewed in isolation. However, intent to kill must be inferred from all the circumstances and all defendant's conduct. (*People v. Chinchilla* (1997) 52 Cal.App.4th 683, 690.) An aider and abettor's mental state may be inferred from his "'presence at the scene . . . , companionship, and conduct before and after the crime, including flight.'" (*People v. Medina*, *supra*, 46 Cal.4th at p. 924.) Thus, the jury could reasonably infer an intent to kill by considering not only the act of loading the rifle, the DNA on it, and the GSR on Drake's hand, but also Drake's use of a napkin to avoid fingerprints and GSR, his throwing his gloves out the window soon after the shooting, his expressed intent to shoot rival gang members, his membership in the same gang as Riser and their companionship during that day, his presence in the car at the crime scene, and his flight with Riser after the shooting.

We conclude from consideration of all the evidence in the light most favorable to the judgment that substantial evidence supported the judgment, and further, that any rational jury would have found beyond a reasonable doubt that Drake possessed the requisite intent to kill.

## V. Pleading variance

Drake and Spry contend that the sentence enhancement imposed as to counts 7, 8, and 9 pursuant to section 12022.53, subdivision (d), must be stricken as unauthorized due to defective pleading.[10]

Section 12022.53 provides sentence enhancements for the discharge of a firearm in the commission of enumerated crimes, and under subdivision (d) of that section, an enhancement of 25 years to life is applicable when discharging the firearm has caused great bodily injury or death. The information alleged with regard to counts 1, 2, 3, 4, 5, and 6, that a principal personally and intentionally discharged a rifle, causing great bodily injury or death to a victim within the meaning of subdivisions (b), (c), (d), and (e)(1). As to counts 7, 8, 9, the information alleged that a principal personally used and intentionally discharged a rifle, within the meaning of subdivisions (b), (c), and (e)(1).

As the attempted murders were the result of the same incident that caused great bodily injury and death to Cendejas-Cortes, the enhancement under section 12022.53, subdivision (d) could have been properly alleged as to all counts, even as to counts 7, 8, and 9, involving victims who did not suffer great bodily injury. (See *People v. Oates* (2004) 32 Cal.4th 1048, 1055-1057.) The information alleged in counts 1 through 6 all the facts necessary to the enhancement under subdivision (d), but not in counts 7, 8, and 9.

"'No principle of procedural due process is more clearly established than that notice of the specific charge, and a chance to be heard in a trial of the issues raised by that charge, if desired, are among the constitutional rights of every accused in a criminal proceeding in all courts, state or federal.' [Citation.]" (*People v. Thomas* (1987) 43 Cal.3d 818, 823, quoting *Cole v. Arkansas* (1948) 333 U.S. 196, 201.) Thus, for example, a court lacks jurisdiction to convict the defendant of an uncharged offense that is not necessarily included in the alleged offense. (*People v. Lohbauer* (1981) 29 Cal.3d 364, 368.)

---

**10** All further references to statutory subdivisions are to section 12022.53.

"""Due process of law requires that an accused be advised of the charges against him in order that he may have a reasonable opportunity to prepare and present his defense and not be taken by surprise by evidence offered at his trial." [Citation.]' [Citation.]" (*People v. Lohbauer, supra*, 29 Cal.3d at p. 368.) Such notice need not necessarily be given "by a factually detailed information" but may also be given by preliminary hearing evidence and obtained through discovery. (*People v. Jennings* (1991) 53 Cal.3d 334, 358.) "'The test of the materiality of variance in an information is whether the pleading so fully and correctly informs a defendant of the offense with which he is charged that, taking into account the proof which is introduced against him, he is not misled in making his defense.' [Citation.]" (*People v. Maury* (2003) 30 Cal.4th 342, 427.) Thus, striking an enhancement is unwarranted where defendant has had sufficient notice that it will be imposed if proven, and the defendant has not been misled to his prejudice. (*People v. Thomas, supra*, 43 Cal.3d at pp. 830-831.)

Relying on *People v. Mancebo* (2002) 27 Cal.4th 735, *People v. Botello* (2010) 183 Cal.App.4th 1014, and *People v. Arias* (2010) 182 Cal.App.4th 1009, Drake contends that the issue cannot be forfeited by a failure to raise it in the trial court, even where the defendant is on notice of the facts supporting the enhancement and the jury has found those facts to be true. We need not decide whether defendants have forfeited the issue, as it is apparent they received sufficient notice to satisfy due process. We also agree with respondent that the cited cases are distinguishable. There, sentences were imposed without sufficient notice to satisfy due process, as the enhancements were neither specially alleged nor presented to the jury to make a specific finding. (See *Mancebo*, at pp. 743, 747-749; *Arias*, at p. 1017; *Botello*, at pp. 1017, 1021.)

Here, preliminary hearing testimony included the facts of the shooting and Detective Laren's description of arriving at the crime scene and finding Cendejas-Cortes dead from an apparent gunshot wound to the head. The facts necessary to support a section 12022.53, subdivision (d) enhancement were then alleged in the information with regard to counts 1 through 6. After the parties rested at trial, the trial court instructed the jury to determine as to all counts whether a principal personally and intentionally

26

discharged a firearm and caused great bodily injury or death, and the court expressly referred to counts 1 through 9. The verdict forms for counts 7, 8, and 9, like the verdict forms for counts 1 through 6, directed the jury to find true or not true "the allegation, pursuant to Penal Code section 12022.53(d), that a principal discharged a firearm, to wit, a rifle that proximately caused great bodily injury or death to Amador Cendejas-Cortes." The jury found the allegations true.

Under nearly identical circumstances, an appellate court held that the defendant was afforded sufficient notice that the enhancement applied to all counts. (*People v. Riva* (2003) 112 Cal.App.4th 981, 1001.) The court pointed out that section 12022.53, subdivision (d) requires pleading necessary facts, but does not specify where in the information the facts must be alleged. (*Riva*, at p. 1001.)[11] The defendant thus had fair notice of the facts of the enhancement, and a failure to plead the same facts in all counts did not interfere with his ability to defend against them. (*Id.* at p. 1002.)

Here moreover, defendants do not claim to have been misled by the variance. The death of Cendejas-Cortes was at issue regardless, and defendants do not claim that their defense would have been any different or that they would have proceeded in any other way. Defendants' counsel each stated on the record that they had reviewed the proposed jury instructions and had no objection to any of them. The record reflects that all counsel expressly agreed to the verdict forms, including the finding on subdivision (d) on each of the nine counts. After the jury reached their verdicts but before it was pronounced, a juror questioned the verdict forms because the same victim appeared in the special allegations. The trial court also questioned whether the subdivision (d) enhancement

---

[11] The pleading requirements, which are set out in subdivision (j) of section 12022.53 and remain unchanged since *Riva* was published, are as follows: "(j) For the penalties in this section to apply, the existence of any fact required under subdivision (b), (c), or (d) *shall be alleged in the accusatory pleading* and either admitted by the defendant in open court or found to be true by the trier of fact. When an enhancement specified in this section has been admitted or found to be true, the court shall impose punishment for that enhancement pursuant to this section rather than imposing punishment authorized under any other provision of law, unless another enhancement provides for a greater penalty or a longer term of imprisonment." (Italics added.)

could be applied to all counts based upon the death of a single victim. The prosecutor explained the rule, and later supplied the citation to *People v. Oates, supra*, 32 Cal.4th 1048. She and Drake's counsel represented to the court that all counsel had agreed to the verdict forms. Spry brought a motion for new trial, but did not mention the variance. Finally, none of the defendants objected when the trial court included the enhancement in their sentences.

We construe counsels' actions as an acknowledgement that notice to the defendants was sufficient, they had not been misled, and their defense had not been affected. Indeed, any objection would most likely have led to an amendment to conform to proof, as defendants did not have to defend against any new facts, and had been given sufficient notice by the preliminary hearing, the information, discovery, trial, instructions, the verdict forms, and their conference regarding the verdict forms. (See § 1009.) The sentence enhancements are thus not unauthorized and striking them is unwarranted.

### DISPOSTION

The judgments are affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
CHAVEZ

We concur:


_____, P. J.
BOREN


_____, J.*
FERNS


_____
* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

28